Carney R. Shegerian, Esq., State Bar No. 150461
CShegerian@Shegerianlaw.com
William Reed, Esq., State Bar No. 261931
WReed@Shegerianlaw.com
Jacob A. Sanandaji, Esq., State Bar No. 351290
JSanandaji@Shegerianlaw.com
SHEGERIAN & ASSOCIATES, INC.
11520 San Vicente Boulevard
Los Angeles, California 90049
Telephone Number:  (310) 860-0770
Facsimile Number:   (310) 860-0771

Attorneys for Plaintiff,
JAMES BRIAN KISS

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES BRIAN KISS,<br><br>        Plaintiff,<br><br>vs.<br><br>FEDERAL DEPOSIT INSURANCE CORPORATION; TRAVIS HILL, in his official capacity as Acting Chairman of the FDIC; PAUL WORTHING; JOHN VOGEL; and DOES 1 to 100, inclusive,<br><br>        Defendants. | Case No.:<br><br>**PLAINTIFF JAMES BRIAN KISS' COMPLAINT FOR DAMAGES FOR:**<br><br>  **(1)  DISCRIMINATION IN VIOLATION OF TITLE VII;**<br><br>  **(2)  HARASSMENT IN VIOLATION OF TITLE VII;**<br><br>  **(3)  RETALIATION IN VIOLATION OF TITLE VII;**<br><br>  **(4)  FAILURE TO PREVENT DISCRIMINATION, HARASSMENT, OR RETALIATION IN VIOLATION OF TITLE VII;**<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

**Page**

SUMMARY ................................................................................................................. 1

PARTIES .................................................................................................................... 2

JURISDICTION AND VENUE ................................................................................ 4

EXHAUSTION OF ADMINISTRATIVE REMEDIES ........................................... 5

FACTS COMMON TO ALL CAUSES OF ACTION .............................................. 5

FIRST CAUSE OF ACTION .................................................................................. 24

    Discrimination on the Bases of Sex/Gender in Violation of Title VII of the
    Civil Rights Act of 1964 (42 U.S.C. § 2000 (e), *et seq.*) Against Entity
    Defendants and DOES 1-100, Inclusive ........................................................... 24

SECOND CAUSE OF ACTION ............................................................................. 25

    Hostile Work Environment / Harassment for on the Bases of Sex/Gender in
    Violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000(e), *et
    seq.*) Against All Defendants and DOES 1-100, Inclusive ............................... 25

THIRD CAUSE OF ACTION ................................................................................. 26

    Retaliation for Engaging in Protected Activity in Violation of Title VII of the
    Civil Rights Act of 1964 (42 U.S.C. § 2000(e), *et seq.*) Against All
    Defendants and DOES 1-100, Inclusive ........................................................... 26

FOURTH CAUSE OF ACTION ............................................................................. 28

    Failure to Prevent Discrimination, Harassment, and Retaliation in Violation of
    Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000(e), *et seq.*)
    Against All Defendants and DOES 1-100, Inclusive ........................................ 28

PRAYER .................................................................................................................. 29

# TABLE OF AUTHORITIES

**Page**

## Statutes

28 United States Code § 1331 ................................................................................ 4

28 United States Code § 1343 ................................................................................ 4

28 United States Code § 1346 ................................................................................ 4

28 United States Code § 1391 ................................................................................ 4

28 United States Code § 1402 ................................................................................ 4

42 United States Code § 1981a ............................................................................ 23

42 United States Code § 2000-5 ............................................................................ 4

42 United States Code § 2000e, *et seq.* ........................................................ passim

42 United States Code § 5891 ........................................................................... 3, 4

Code of Civil Procedure § 474 .............................................................................. 3

Government Code § 12923 ................................................................................... 25

## Rules

Federal Rules of Civil Procedure, Rule 38 ......................................................... 29

Plaintiff, James Brian Kiss ("Plaintiff" or "Kiss"), alleges, on the basis of personal knowledge and/or information and belief:

## SUMMARY

Plaintiff, James Brian Kiss (hereafter "Plaintiff" or "Kiss"), was a devoted Field Supervisor for Defendant Federal Deposit Insurance Corporation ("Defendant" or "FDIC"). **For over three decades, Kiss devoted his life and career to Defendants**. Kiss' willingness to go above and beyond his duties and responsibilities set him apart from his peers, where he diligently helped his direct and indirect reports grow in their careers. It was a sense of personal satisfaction for Kiss to watch the employees he managed grow.

But after an ***employee inappropriately questioned another employee's qualifications,*** Kiss counseled said employee. ***After taking corrective action***, the employee submitted a complaint about Kiss, on the belief that without a male manager holding her back, she could get promoted. Shortly thereafter, ***Kiss was suddenly told he would be investigated*** without being told for what and placed on leave. For approximately three months, **Kiss was kept in the dark**. Despite asking Defendants what he was being investigated for, Kiss was never told anything.

Approximately one month later, Kiss was told he needed to appear for deposition. Over the span of two days, accounting for almost fourteen hours of intense questioning about his "leadership style," Kiss was gruesomely interrogated because there were **sudden concerns about how he managed others**. Kiss was defeated. He never thought his leadership was in question and never had reason to suspect such either.

Shortly thereafter, the Wall Street Journal published an article about an alleged toxic work environment for women at the FDIC. To add insult to injury, *Kiss was named in the article, despite having little to no direct supervision over female employees named in the article.* It appeared only FDIC male managers were listed to be intentionally scapegoated for the alleged toxicity.

///

Over the next six months, as public scrutiny and condemnation of Kiss and other FDIC male managers intensified, ***Defendants conducted a witch-hunt***, finding anything they could about Kiss, to legitimize the reasons in support of his termination. After talking to over a dozen employees, ***scouring for incidents and complaints over the span of ten years*** – raising "issues" Kiss was never informed of – did Defendants find their "reasons." Unsurprisingly, **Defendants' reasons** were <u>**severely exaggerated**</u>, <u>**taken out of context**</u>, and/or <u>**meritless**</u>.

As for Kiss, <u>**he was unceremoniously terminated**</u>, <u>**stripped of his over three decades of service**</u>, having been scapegoated for <u>**the problems outlined in the Wall Street Journal article that demonstrated rampant problems in other FDIC branches**</u>. For certain, <u>**Kiss was targeted due to his gender**</u>.

Plaintiff brings this action against defendants pursuant to Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 2000(e) *et. seq.*, for economic, non-economic, compensatory, and punitive damages, pre-judgment interest, and costs and reasonable attorneys' fees.

## PARTIES

1. *Plaintiff:*  Plaintiff James Brian Kiss (hereafter "Plaintiff" or "Kiss") was, and at all times mentioned in this Complaint, a resident of the County of San Francisco, California.

2. *Defendants:*  Defendant <u>Federal Deposit Insurance Corporation</u> ("Defendant" or "FDIC") is, and at all times mentioned in this Complaint, was authorized to operate by the United States Government and was qualified to conduct business in San Francsico County. Defendant's principal place of business at all relevant times was located in San Francisco, California, located at 25 Jessie Street, Suite 2300, San Francisco, California 94105.

3. Defendant <u>Travis Hill</u> ("Hill"), at all times mentioned in this Complaint, and was, an employee for Defendant. Defendant Worthing is, and at all times mentioned in this Complaint was believed to be, a resident of Washington, D.C. Defendant <u>Paul Worthing</u> ("Worthing"), at all times mentioned in this Complaint, and was, an employee for

Defendant. Defendant Worthing is, and at all times mentioned in this Complaint was believed to be, a resident of California. Defendant <u>John Vogel</u> ("Vogel"), at all times mentioned in this Complaint, and was, an employee for Defendant. Defendant Vogel is, and at all times mentioned in this Complaint was believed to be, a resident of New York.

4.    *Doe defendants:* Defendants Does 1 to 100, inclusive, are sued under fictitious names pursuant to Code of Civil Procedure section 474. Plaintiff is informed and believes, and on that basis alleges, that each of the defendants sued under fictitious names is in some manner responsible for the wrongs and damages alleged below, in so acting was functioning as the agent, servant, partner, and employee of the co-defendants, and in taking the actions mentioned below was acting within the course and scope of his or her authority as such agent, servant, partner, and employee, with the permission and consent of the co-defendants. The named defendants and Doe defendants are sometimes hereafter referred to, collectively and/or individually, as "defendants."

5.    *Relationship of defendants:* All defendants compelled, coerced, aided, and/or abetted the discrimination, retaliation, and harassment alleged in this Complaint, which conduct is prohibited under 42 U.S.C. § 5891, Title VII of the Civil Rights Act of 1964, and 42 U.S.C. § 2000(e) *et. seq*. All defendants were responsible for the events and damages alleged herein, including on the following bases: (a) defendants committed the acts alleged; (b) at all relevant times, one or more of the defendants was the agent or employee, and/or acted under the control or supervision, of one or more of the remaining defendants and, in committing the acts alleged, acted within the course and scope of such agency and employment and/or is or are otherwise liable for plaintiff's damages; (c) at all relevant times, there existed a unity of ownership and interest between or among two or more of the defendants such that any individuality and separateness between or among those defendants has ceased, and defendants are the alter egos of one another. Defendants exercised domination and control over one another to such an extent that any individuality or separateness of defendants does not, and at all times herein mentioned did not, exist. Adherence to the fiction of the separate existence of defendants would permit abuse

of the corporate privilege and would sanction fraud and promote injustice. All actions of all defendants were taken by employees, supervisors, executives, officers, and directors during employment with all defendants, were taken on behalf of all defendants, and were engaged in, authorized, ratified, and approved of by all other defendants.

6.   Defendant FDIC both directly and indirectly employed plaintiff Kiss, as defined in by 42 U.S.C. § 5891, Title VII of the Civil Rights Act of 1964, and 42 U.S.C. § 2000(e) *et. seq.*

7.   In addition, defendant FDIC compelled, coerced, aided, and abetted the discrimination, harassment, and retaliation, which is prohibited under 42 U.S.C. § 5891, Title VII of the Civil Rights Act of 1964, and 42 U.S.C. § 2000(e) *et. seq.*

8.   Finally, at all relevant times mentioned herein, all defendants acted as agents of all other defendants in committing the acts alleged herein.

## JURISDICTION AND VENUE

9.   This action arises under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C § 2000(e) et. seq. This Court has original jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331, 1343 (a)(4), and 1346 (b)(1). This Court has jurisdiction over this matter pursuant to Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, and 28 U.S.C. § 1442(a)(1).

10.   Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(2) and 1402 (b) and 42 U.S.C. § 2000-5(f)(3). The FDIC is subject to personal jurisdiction in this District in that it maintains facilities and business operations in this District, employs Plaintiff in this District, and all or most of the acts giving rise to this action occurred in this District. Not only that, but Plaintiff resides in the Northern District of California and the events described in the complaints arose in this district.

///

///

///

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

11.　All conditions precedent to filing claims under Title VII have been performed or have occurred. In particular, Kiss timely filed a charge of discrimination with the U.S. Equal Employment Opportunity ("EEO") on June 25, 2024.

12.　Kiss also filed a Formal Complaint of Discrimination with the EEO on August 21, 2024. It has been 180 days since he filed his formal complaint of discrimination.

13.　Thus, Plaintiff fully exhausted his administrative remedies and is entitled to file in this district court. This Complaint is filed within the appropriate time.

**FACTS COMMON TO ALL CAUSES OF ACTION**

14.　*Plaintiff's hiring and Employment with Defendants*:

a.　In or around 1992, James Brian Kiss ("Kiss"), a now fifty-five-year-old Caucasian male, was hired as a Bank Examiner for the Federal Deposit Insurance Corporation ("FDIC"). Kiss was a well-respected examiner who held multiple leadership roles, examining banks for the FDIC. This included positions at some of the largest banks in the San Francisco region.

b.　In or around 2007, Kiss was promoted to the Supervisory Examiner role in the San Francisco Field Office working for Field Supervisor Necia Marlowe, supervising approximately ten employees.

c.　In or around 2012, Kiss was promoted to the Field Supervisor role in the San Francisco Field Office, leading one of the largest offices by total assets and headcount in the country. As Field Supervisor, Kiss directly supervised and managed approximately six supervisory examiners, administrators, a senior examiner, had over fifty indirect reports, and had the ability to promote staff members throughout his office.

15.　*Kiss' Exemplary Performance Throughout His Employment*:

a.　Over Kiss' thirty-one-year career, he held numerous leadership and management positions, consistently receiving positive annual reviews and numerous awards. His performance ratings were consistently high, where he received various awards

for being one of the top examiners for the FDIC. During his employment, Kiss received the following accolades, some of which were among the highest awards available:

- <u>2017 Mission Achievement Award</u>: Kiss was recognized for work force training and development, effective staff turnover management, and maintaining strong performance.

- <u>2018 STAR Award</u>: Kiss was commended for strategic management and effective handling of staff rotation.

- <u>2019 Mission Achievement Award</u>: Kiss was acknowledged for addressing employee conduct issues promptly and maintaining strong inter-agency relationships.

- <u>2020 Mission Achievement Award</u>: Kiss was praised for managing staffing challenges and balancing examination needs.

- <u>2021 Mission Achievement Award</u>: Kiss was lauded for handling staff turnover and developing personnel at all levels.

- <u>2022 STAR Award</u>: Kiss was commended for strategic management and effective handling of staff rotation.

16.  <u>*Kiss' Dedication to Preventing a Hostile Work Environment*</u>:

a.  Throughout Kiss' tenure with the FDIC, he was dedicated to fostering a fair and welcoming working environment. ***The San Francisco Field Office saw significant advancements in diversity, equity, and inclusion under his leadership***. Although Kiss was not directly responsible for hiring new employees, he was responsible for all promotions in his office.

b.  In or around 2012, Kiss established both an anonymous lockbox for employees to submit complaints and an e-mail account for employees to report concerns. Further, Kiss tried meeting with union representatives at least every calendar-quarter to discuss working conditions at the San Francisco Field Office. During the union meetings, ***no union representative ever stated there was ongoing harassment or a hostile working environment***, or any other complaint for that matter, in his office.

c.   Although the San Francisco field office was approximately thirty percent female, **Kiss promoted females to key management positions**, **promoted female managers** that made up fifty percent of supervisory examiners, directly promoted three of five supervisory examiners to the highest positions in the office (*i.e.*, supervisory examiners), **promoted <u>several females to the second highest position</u> in the field office** (*i.e.*, the large financial institute examiner in charge – CG-15), and equally advocated and encouraged examiners, male and female alike, to seek promotions.

d.   The three female supervisory examiners who reported directly to Kiss, Annalie Sanchez, Christy Cornell-Pape, and Carmela Torrelli, were all encouraged and directly promoted by Kiss. These same **<u>female supervisory examiners were some of the next-in-line employees</u>** to lead the San Francisco Field Office.

e.   Kiss maintained an open-door policy to allow employees to report any concerns they had. If employees did not feel comfortable complaining to Kiss, he advocated, encouraged, and suggested employees go to their direct supervisors, who would report back to Kiss. However, Kiss himself never received complaints from employees or their supervisors.

17.   *<u>Kiss' Dedication to Ensuring Employees Understood that a Hostile Work Environment Would Not be Tolerated</u>*:

a.   When Kiss became aware of inappropriate behavior in the workplace, he took immediate action to stop it.

b.   In or around 2014, at an office Christmas party, Cornell-Pape gave a lap dance to then regional director Stan Ivie. The FDIC did not terminate Ivie's employment, or the current regional director, Paul Worthing. Worthing was at the 2014 party and was certainly aware of the incident.

c.   On another occasion, Cornell-Pape, who was already a supervising examiner, wore attire Kiss thought was inappropriate for someone in leadership at the FDIC. Kiss counseled her on her professionalism and questioned whether she thought her attire negatively impacted her promotional opportunities.

d.   On several occasions, Cornell-Pape handed out risqué flyers for a burlesque show she participated in. Kiss instructed her to cease handing out these flyers because it was inappropriate for a manager to promote such shows at work and to invite her professional colleagues and subordinates. Cornell-Pape stopped shortly thereafter.

e.   Cornell-Pape was also known for her provocative behavior and initiating sexualized conversations such as openly discussing her interest in bondage and discipline, dominance and submission, and sadism and masochism ("BDSM") and her sexual relationship with her husband.

f.   On another occasion, Cornell-Pape brought her pet to work, and allowed it to crawl under her shirt and between her breasts, causing a disturbance and distraction throughout the office. Upon witnessing the incident, he sent her home.

g.   On other occasions, Cornell-Pape would shake her chest during manager meetings without provocation.

18.   _Kiss Learns that His Subordinate Mistreated another Employee_:

a.   In or around May 2023, Kiss led an all-hands field office meetings, to discuss general operational policies and issues and reassure staff at the San Franscisco Field office.

b.   At the end of Kiss' six-hour meeting, Senior Examiner, Kendra Berch ("Berch") had a public breakdown in the office and **_began openly speaking badly about another employee_** over a promotion she applied for, that would enable her to achieve a promotion to a CG-15, but believed she was unfairly passed over for. Although Kiss already selected Berch for this promotion, he could not inform her because her selection was not finalized.

c.   **Berch** loudly **wailed**, **acted uncontrollably**, and **openly complained about the other examiner**, claiming the other examiner was lazy and unknowledgeable. As Kiss saw and heard Berch crying and acting uncontrollably, Cornell-Pape tended to Berch to calm her down.

d.   Because Berch had a history of openly talking badly and complaining about other employees, Kiss needed to take corrective action.

19. _Kiss Meets with Berch_:

a. Thereafter, Kiss asked to meet with Berch to discuss her earlier actions. During their meeting, Kiss explained to Berch that as a Senior Examiner, who supervised other employees and sought to be promoted, it was inappropriate for her to act in the manner she did. However, Berch was resistant to Kiss' feedback. Because Kiss had high expectations for his examiners in leadership positions, and expected them to act professionally, Kiss explained that if she did not change her actions, she could not hold a management position at the San Francsico Field Office.

b. On information and belief, following Kiss' discussion with Berch about her actions, **Berch became disgruntled that she was being counseled by a male manager**, and _**developed an urge to get rid of Kiss to increase her chances of being promoted**_.

20. _Berch Submits a Complaint About Kiss_:

a. In or around June 2023, following Kiss' meeting with Berch, she submitted a complaint about Kiss to Regional Director, Kathy Moe ("Moe"). **Berch significantly fabricated her complaints about Kiss' leadership and his actions and inactions in the office**, in an effort to get rid of him. On information and belief, _Berch believed if a male manager, such as Kiss, was out of the way, she would have a better chance at receiving a promotion_. Thus, to further this effort, it is believed that Berch intentionally fabricated her complaints to make it appear that Berch and other employees had issues with Kiss, a male manager. On information and belief, _**because Berch sought a female manager, she was willing to take any action to ensure Kiss, a male manager, was removed from his position**_.

21. _Kiss Learns He Will be Investigated Following Berch's Complaints_:

a. On or around June 22, 2023, Moe suddenly called Kiss. During the call, Moe explained Kiss' leadership abilities would be investigated. Kiss was shocked and confused, as he had no reason to suspect he would be investigated for anything. _Despite asking for the specifics and purpose of the investigation, Moe was unwilling to reveal anything more_.

b.   Moe informed Kiss he would be entitled to full pay, but he would be temporarily reassigned to a lower position during the investigation. As part of the temporary reassignment, Kiss would have no direct reports, and his daily responsibilities would be severely limited. Because Kiss did not think reassignment appropriate, Kiss took a combination of his annual leave, sick leave, and unpaid administrative leave. Moe informed Kiss his reassignment was effective immediately. When Kiss asked how long the investigation would last, Moe indicated she did not know.

22.   *Kiss is Publicly Escorted Out of His Office*:

a.   Approximately thirty minutes after Kiss' call with Moe ended, Assistant Regional Director David Wong ("Wong") appeared at his office along with armed guards, ***demanding that Kiss leave the premises immediately***. Barely having time to grab a few personal items, **Kiss was escorted out** in front of his staff, **with armed guards following** him, ***making it appear Kiss engaged in illegal and illicit behavior***. **Kiss was humiliated**.

23.   *Kiss Asks for Status on the Investigation*:

a.   Between July and September 2023, having not heard anything regarding the investigation, Kiss reached out to Human Resources Specialist Rodney Middleton ("Middleton"), but was given no information.

b.   Kiss later learned that during this time, other employees were interviewed and questioned about their interactions with him.

24.   *Kiss is Investigated and Deposed Following Berch's Complaints*:

a.   In or around September 2023, Labor, Employment and Administration Section representative Megan Borovicka ("Borovicka") called Kiss, and told him the FDIC would question him over two days. Borovicka gave Kiss no indication that he would be questioned on anything other than his leadership.

b.   On or around September 28 and 29, 2023, Kiss attended a meeting with Borovicka and Middleton. During Kiss' depositions, Borovicka questioned Kiss for approximately fourteen hours, without ever telling him what claims against him were being investigated.

c.    Following Kiss' intense depositions, *Kiss understood that he was expected to remain silent about what he was asked and his testimony during the pendency of the FDIC's confidential investigation*.

25.    *The Wall Street Journal Contacts Kiss About an Alleged "Toxic Atmosphere" for Women at the FDIC*:

a.    In or around early October 2023, Rebecca Ballhaus ("Ballhaus") of the Wall Street Journal contacted Kiss on his work phone and work email to talk to him about an article she wanted to publish about harassment and a toxic work environment women faced at the hands of their male supervisors at the FDIC. Because Kiss was not allowed to speak on behalf of the FDIC, he did not respond.

b.    Shortly thereafter, in or around mid-October 2023, an FDIC public relations representative told Kiss he was allowed to speak with Ballhaus because he would be named directly in article. Confused, Kiss did not understand why he would be named in the article, let alone have anything to add regarding a toxic work environment. Unwittingly, Kiss remained silent.

26.    *The Wall Street Journal Publishes an Article About an Alleged "Toxic Atmosphere" for Women at the FDIC, Directly Naming Kiss*:

a.    On or around November 13, 2023, Ballhaus' published her article – "*Strip Clubs, Lewd Photos and a Boozy Hotel: The Toxic Atmosphere at Bank Regulator FDIC*" in the Wall Street Journal. Said article reported the alleged mistreatment of women at the FDIC at the hands of their male counterparts and supervisors. A copy of this article is submitted herewith as **Exhibit 1**.

b.    Ballhaus therein, claimed: **(i)** "***Female examiners left the FDIC because of what they say was a sexualized, boys' club environment and the belief they were consistently given fewer opportunities than their male counterparts***," **(ii)** "***male examiners talked openly about female colleagues' appearances***," and **(iii)** "***[m]any women said they felt their male colleagues were able to progress more quickly, in part because they would go golfing and out drinking with their supervisors—and then get***

***plum assignments***.”

      c.   As part of her article, Ballhaus referenced incidents and complaints, some dating back to 2010, in various cities across the United States, about harassment and a hostile work environment females faced working for the FDIC. She outlined that ***the FDIC was a 'boys club' males controlled***, that forced females to engage in inappropriate behavior to 'get ahead.' Not only that, but ***the FDIC ignored females' complaints and allowed their mistreatment***. During trainings in other cities, male supervisors and peers encouraged and instructed females to go drinking with their male counterparts, where they were subsequently harassed on the way back to their hotel rooms or asked to engage in sexual behavior. Ballhaus claimed ***the FDIC was "a culture of harassment and misogyny"*** and women learned to accept their fate.

      d.   Ballhaus clearly alluded that <u>**male supervisors controlled the FDIC**</u>, and female employees were secondary employees. That *females could raise concerns*, but those ***concerns would fall on male managers' deaf ears***. That the *FDIC's male managers created a culture of allowing, ratifying, and promoting a hostile work environment for females*, and allowed harassment in FDIC offices. Ballhaus' article was clear: <u>**male supervisors were the issue, and the FDIC needed to get rid of them**</u>.

      e.   In the article, **Kiss was directly referenced several times**:

An examiner-in-training complained about harassment from **Jim Kiss**, a field supervisor in San Francisco, to his trainee liaison as early as 2014, according to an email reviewed by the Journal. Kiss remained in charge until this summer, **when multiple employees further complained to management**, according to current and former employees.

**Kiss** remarked on employees' appearances, made homophobic and harassing comments and talked about his drug use in the office, former employees said. He bragged about his sex life and talked about the importance of sex in keeping a marriage strong.

Management had started looking into the working environment in the field office in 2022, a former FDIC official said. This summer, after the Journal began speaking with women about **Kiss's** behavior, he was moved to a temporary position of acting case manager. He is currently on leave. Internal

investigators are looking into Kiss's leadership, according to current and former employees.

f.    When Kiss first read the article, he was shocked and outraged, as the allegations were almost all false.

g.    Kiss was even more surprised to be named because of the numerous female employees listed in the article, *only two of them ever worked in the San Francisco Field Office*, and they were employees Kiss neither interacted with on a daily basis or directly supervised. Moreover, many of the *incidents complained of happened at other office locations he never visited*, was never made aware of, and/or not involved in in any capacity. Kiss felt he was being scapegoated for a toxic workplace culture and issues throughout the FDIC unrelated to him or his office for being a male manager, would be pushed out soon, and replaced by a female because of the allegations in the article.

h.    On or around November 14, 2023, the same article was published in print and made the center-front page of the Wall Street Journal above the fold:



i.    Public condemnation of the FDIC, and its male managers, by both civilian and policy makers, began shortly thereafter. The FDIC was forced to swiftly take action.

27.   *The House Committee on Financial Services Issues a Scatting Report on the FDIC*:

a.   On or around November 17, 2023, in the wake of Ballhaus' Wall Street Journal article, the *House Committee on Financial Services indicated they would **investigate male managers'** misconduct and the toxic workplace culture at the FDIC*. This was **only the start** of the **public condemnation** and **scapegoating** of **male FDIC managers** such as Kiss.

b.   On or around November 19, 2023, the House Committee on Financial Services published a scatting forty-three-page report entitled, "A Toxic Workplace: The FDIC's Culture of Misconduct Under Chair Gruenberg and Needed Reforms," outlining alleged prevalent issues throughout FDIC offices.

c.   As part of the executive summary in its report, the House Committee claimed:

In November 2023, the Wall Street Journal reported allegations of a toxic workplace culture, including harassment and discrimination, at the agency. The article describes instances where senior managers abused their leadership positions by bullying young bank examiners and other subordinates. The articles that followed further describe Chairman Gruenberg's own misconduct and mistreatment of FDIC staff.

Since November 2023, the House Committee on Financial Services (Committee) has investigated the failures of the agency, which continue to foster a toxic culture that employees have endured for years. Information obtained by the Committee shows the consequences of Chairman Gruenberg's leadership at the agency over the last 20 years. In addition, an independent third-party review contemplated whether Chairman Gruenberg could lead the agency through the necessary cultural changes that must be made at the agency

d.   The House Committee concluded:

The safety, security, and soundness of the American banking and financial system is dependent on the employees of the agencies who regulate it. The FDIC's toxic workplace environment threatens our banking system. The promotion of a boy's club attitude in particular led to an insular culture leaving employees feeling isolated and alone. At the same time, the FDIC is attempting to ensure the safety and stability of the financial system. It is

evident that these issues existed prior to his arrival, however, Chairman Gruenberg has only exacerbated the toxicity of the workplace environment at the FDIC over his near twenty-year tenure.

[…]

The FDIC needs a cultural change now. However, this cultural change cannot progress until Chairman Gruenberg steps down or is removed and allows the FDIC to move on from his failed leadership. Committee Republicans agree with the recommendations of the Cleary Gottlieb report.

e.     Unsurprisingly, ***Kiss was not interviewed, contacted, or named in or as part of this report***. The political witch hunt to scapegoat unwitting male managers so that the FDIC and Federal Government could save face begun. As to Kiss, ***the FDIC began their witch-hunt into tarnishing his reputation as a male manager*** who cared about all of his employees, male and female alike. But the FDIC did not care, or think twice about throwing him out like the trash, despite his decades-long career.

f.     On or around November 21, 2023, following the publication of Ballhaus' Wall Street Journal article, the FDIC announced the establishment of a Special Review Committee to oversee an independent review of the FDIC's "workplace culture." As part of its announcement, the FDIC indicated, that "[a]ll employees at the FDIC need to feel safe and able to speak out if they are subject to, witness or encounter inappropriate behavior in the workplace. Sexual harassment, discrimination, and other misconduct are totally unacceptable and have no place at the FDIC." ***By establishing the Special Review Committee, the public's condemnation of the FDIC intensified, as did the FDIC's intent of getting rid of its male managers***.

g.     On or around December 11, 2023, the FDIC hired the law firm Cleary Gottlieb Steen & Hamilton, LLP to investigate concerns raised in Ballhaus' Wall Street Journal article. Again, <u>all eyes pointed to the FDIC attempting to get rid of male managers</u> in an overhaul of the FDIC's workplace culture following intensive public condemnation and scrutiny.

///

28. _Having Not Heard Anything from the FDIC, Kiss Retains His Own Legal Counsel_:

a.   In or around late December 2023, as investigations into the misconduct and toxic workplace culture at the FDIC increased nationally, Kiss began feeling worried that male supervisors, such as himself, would be investigated at the local level, blamed for issues at the national level – for problems he did not cause or was involved in – and eventually be forced to wrongfully resign or be terminated to rehabilitate the FDIC's image.

b.   On or around January 5, 2024, because Kiss felt public scrutiny and condemnation of male managers escalated, Kiss took action to protect himself as a male manager, before being unceremoniously stripped of his career. Kiss' attorney sent Regional Director Paul Worthing ("Worthing") and the FDIC notice of representation. The letter of representation indicated:

> Mr. Kiss has been on unpaind [sic] leave since June 22, 2023. Other than submitting to a multi-day interview in September 2023 – during which Mr. Kiss was not represented by counsel – Mr. Kiss has not received any substantive update or communication from the FDIC regarding the status of its purported investigaiton [sic] or Mr. Kiss' projected return to work date.

c.   Kiss' attorney asked Worthing for a call to discuss the matter.

29. _Kiss is Suddenly Told He is Being Removed from his Position at the FDIC_:

a.   Following public condemnation and scrutiny of the FDIC and its male managers, **it became clear to the FDIC that Kiss' earlier testimony would be adverse to its already increasingly tarnished public image and reputation and interests generally**. Kiss' deposition testimony was extremely unfavorable to the FDIC – and on strong information and belief – **the FDIC did <u>NOT</u> like what it heard**, **did not want Kiss to be heard**, and **took immediate action to ensure Kiss would remain silent** about his earlier testimony. To be clear however, the testimony was not adverse due to the actions of Kiss.

///

///

b.  On or around January 24, 2024, Regional Director Paul Worthing ("Worthing") sent Kiss a Notice of Proposed Removal, outlining nine specifications in support of his removal from his position with the FDIC.

c.  The nine specifications alluded to Kiss: using colorful language at the office, commenting about females' appearance in the office, counseling his reports, allowed sexualized banter throughout the office, raising his voice, discussing his drug use, and speaking with other employees during the pendency of the FDIC's investigation. However, most of the specifications referenced issues that were either **(i)** false, **(ii)** stale, from years ago, **(iii)** never brought to Kiss' attention, or **(iv)**, taken way out of context, or highly exaggerated.

d.  Worthing's Notice of Proposed Removal included language clearly evincing the fact that Kiss was the FDIC's fall *guy*:

> The impact of your inappropriate conduct has also been compounded by notoriety through recent media coverage damaging the reputation of the FDIC. On November 13, 2023, the Wall Street Journal published an article about the work environment at the FDIC, which, among other allegations, referenced the investigation into your conduct, and asserted that current and former employees complained about your treatment of them and that you talked about your drug use in the office.

> [¶ … ¶]

> … The work environment you have cultivated in the SFFO has been negative for employees in many aspects, and because of the breadth of oversight and influence of your position, those impacted employees now work throughout the San Francisco Region, in the SFFO, in the Regional Office, and throughout additional Field Offices, Regions, and Headquarters. Due in part to my experience with your resistance to feedback and self-correction, as well as your poor judgement and negative treatment of colleagues as demonstrated by the charged conduct, I do not believe you could effectively assimilate into a non-supervisory role, nor can I trust in the safety of our workforce if you were allowed to perform non-supervisory examination work. Many nonsupervisory roles, for example, require training and mentoring of junior employees and interactions with the public, which I would have grave concerns assigning you because of your serious inappropriate conduct, lapses in judgment, and notoriety.

e.　Kiss was shocked he was given a Notice of Proposed Removal only after the Wall Street Journal article was published and the FDIC claimed to be taking immediate action to review the actions of problematic *male* managers. It was clear to Kiss **the FDIC wanted to take immediate action to rectify public complaints over harassment of females by <u>getting rid of male managers</u>**, in an effort to demonstrate the workplace culture of the FDIC was being repaired. The FDIC clearly muckraked far and wide to look for anything and everything to support Kiss' termination.

30.　*Kiss Responds to the Notice of Proposed Removal*:

a.　On or around March 2024, Kiss' attorney sent a response to Notice of Proposed Removal, explaining　why the Notice of Proposed Removal was improper and false: "Director Worthing has committed ***serious violations of state and federal law*** in connection with the issuance of his preliminary decision, which fails to identify any behavior which would be grounds for immediate termination under the applicable just cause standard because the FDIC failed to meaningfully engage Mr. Kiss in corrective counseling" and "Director Worthing's analysis is also rife with factual inaccuracies and uncontextualized analysis not reflective of Mr. Kiss' tenure with the corporation."

b.　Throughout the response, Kiss explained: **(1)** he *never received a single disciplinary write-up* during his tenure at the FDIC, **(2)** the *FDIC was not complying with his due process rights*, **(3)** that *his due process rights were violated*, and **(4)** listed why each of *the specifications the FDIC used in support of his termination was misrepresented* and individually refuted each specification.

c.　**<u>Kiss also threatened to take legal action against the FDIC</u>** if the Notice of Proposed Removal was not reverted because he was suddenly being terminated after concerns about male managers and supervisors, such as himself, was published in the Wall Street Journal, despite never being made aware of any problems he may have caused.

///

///

d.   On or around March 20, 2024, Kiss met with New York Regional Director of Division of Risk Management Supervision, John Vogel ("Vogel"). During their meeting, Kiss provided his perspective of the Berch incident, provided additional context on the complaints made against him, and refuted each specification in the Notice of Proposed Removal. **Kiss explained that he was a <u>male scapegoat</u> for issues at the FDIC**, and being terminated because of public condemnation and demands that the FDIC be overturned and the culture changed because other male managers, nationally, harassed females.

31.   <u>*Kiss Receives an Amended Notice of Proposed Removal that Suddenly Lists Four Additional Reasons*</u>:

a.   On or around April 15, 2024, unhappy with the original nine reasons in support of Kiss' termination, Worthing issued Kiss a Revised Notice of Proposed Removal, that suddenly included four additional specifications.

b.   The additional specifications alleged that Kiss: **(i)** showed personal sexually provocative text messages, **(ii)** made claims that sexual intercourse was important, **(iii)** made sexually related comments, and **(iv)** yelling at another employee. Like before, these allegations were: **(a)** from years ago, **(b)** from out of the blue as kiss had never been made aware that there were any issues with his conduct, **(c)** taken way out of context, or highly exaggerated. Clearly, the FDIC was unhappy and did not think its original nine reasons were sufficient.

c.   As a man, Kiss was being scapegoated for issues throughout the FDIC and being terminated because of public calls and demands that the FDIC be overturned and the culture changed. ***Had he not been a man, he would not have been terminated***.

32.   <u>*Kiss Responds to the Amended Notice of Proposed Removal*</u>:

a.   On or around April 30, 2024, Kiss' attorney sent a response to the Amended Notice of Proposed Removal.

///

///

b.  In this response, counsel listed why each of the additional specifications the FDIC used in support of his termination was misrepresented and refuted each specification individually.

c.  Counsel added: "The FDIC's lack of just cause for its extreme decision to terminate Mr. Kiss' employment is even more apparent now than it was following distribution of the FDIC's original Notice. The allegations contained in the Amended Notice are a cobbling together of uncontextualized conversations and discrete moments that Director Worthing has cherry-picked from Mr. Kiss' 30-year career in order to misleadingly present Mr. Kiss in the worst light imaginable."

33.  *Kiss Meets with the FDIC About the Four Additional Reasons:*

a.  On or around May 9, 2024, Kiss met with Vogel, Middleton, and Borovicka to provide an oral response to the April 15, 2024, Amended Notice of Proposed Removal.

b.  During the meeting, *Kiss explained that he wanted to return to the FDIC*, was *willing to correct any alleged improper behavior*, and that he *had no knowledge of the reasons why he should be terminated* – as outlined in the both the original and Revised Notices of Proposed Removals – until he received them.

c.  Kiss explained that as a male, **he felt he was <u>being targeted as the "fall *guy*"</u> following the Wall Street Journal article** that outlined male managers were the issue, and that the FDIC was looking for any reason to terminate him, despite never being made aware of any of the reasons in support of his termination.

d.  Kiss went through each of the specifications, explained how each was either false, taken out of context, or never reported to him until recently.

e.  Kiss stated that **<u>the specifications in support of his removal were exaggerated</u>** and did not feel he should be removed for it after over thirty years with the FDIC and never having any kind of discipline against him. Kiss offered to remedy any alleged overly exaggerated mistakes he made during his over thirty-year career with the FDIC.

///

34.  *The FDIC Publishes the Cleary Gottlieb Steen & Hamilton Report on the FDIC*:

a.   On or around May 7, 2024, following the Cleary Gottlieb Steen & Hamilton, investigation into the concerns raised in the Wall Street Journal article, the FDIC published its 234-page report.

b.   The report alluded to outstanding issues the FDIC knew about, covered up, and failed to resolve. The report indicated male managers used their positions to exert control over female managers, as harassment was a rampant issue throughout FDIC offices and personnel, nationally.

c.   Unsurprisingly, Kiss was never interviewed, contacted, or named in or as part of this report.

d.   Again, public condemnation over the FDIC's treatment of women for creating a hostile work environment was made, as calls for the FDIC to take additional corrective actions against male managers intensified exponentially.

35.  *Kiss is Wrongfully Terminated*:

a.   On or around May 14, 2024, Vogel sent Kiss a Notice of Decision, that indicated Kiss be removed from his position immediately.

b.   The final specifications in support of Kiss' removal included all previously provided reasons.

c.   Vogel's Notice also stated:

I have taken into account your over 30 years of service with the FDIC, including your lack of formal discipline and the positive performance reviews you included with your written response. I have considered your arguments that you have not received progressive discipline or corrective counseling, as well as your assertion that the Proposal highlights isolated incidents without context or consideration of the breadth of your positive contributions. Similar to Regional Director Worthing's analysis, however, I find your assertions of never receiving any counseling regarding your conduct an alarming demonstration of resistance to feedback, unreceptiveness to change, and lack of understanding of your own actions. Furthermore, additional counseling or notice was not necessary for you to know the charged conduct was inappropriate. By your own account, throughout your significant tenure with the agency, the FDIC trained you to know better.

***I have also considered your perception that ending your employment with the FDIC unfairly makes you a scapegoat for the increased public scrutiny and criticism the agency faces following recent media coverage of allegations about the FDIC's work environment.*** Media coverage and other investigations have brought matters under a revealing spotlight, but it is your behavior that contributed to the shame brought upon the agency. My decision in this matter is based on your own behavior that has been proven by a preponderance of evidence, as well as consideration of relevant factors for determining an appropriate penalty, including reputational damage to the FDIC due to the notoriety of your inappropriate conduct.

In light of the pervasiveness and serious nature of your conduct, and despite your arguments regarding alleged legal and policy violations, progressive discipline is not appropriate here. The FDIC has an obligation to protect its employees and its mission on behalf of the public. In that vein, I must impose a personnel action commensurate with the egregiousness of your conduct.

I have been a supervisor at the FDIC for over 25 years. Based on my perspective and experience, there is no question in my mind that the frequency and gravity of your inappropriate conduct warrants removal from the FDIC. Although I take seriously your expressions of the importance of this job to you professionally and personally, I do not perceive in your responses to the Proposal any significant remorse, accountability for your behavior, or concern for the employees you supervised and those impacted by your conduct. Your poor judgment and lack of contrition convince me that you cannot be rehabilitated and no alternative sanction is appropriate. You have been afforded more than the legally required notice period following issuance of the Proposal, consistent with your rights to due process.

I have determined your removal is the minimum action required to promote the efficiency of the Federal service. It is my decision that you are removed from your position and from the Federal service effective May 14, 2024.

(emphasis added.)

     d.   Thereafter, Kiss was temporarily replaced by Chris Rook on an interim basis for a brief period. Rook was later temporarily replaced by Melissa Carlson, a female. Carlson was later permanently replaced by Jackie Valderrama, another female.

///

36.  *Economic damages:*  As a consequence of defendants' conduct, plaintiff has suffered and will suffer harm, including lost past and future income and employment benefits, damage to his career, damage to his reputation, and lost wages, overtime, unpaid expenses, and penalties, as well as interest on unpaid wages at the legal rate from and after each payday on which those wages should have been paid, in a sum to be proven at trial.

37.  *Non-economic damages:*  As a consequence of defendants' conduct, plaintiff has suffered and will suffer psychological and emotional distress, humiliation, and mental and physical pain and anguish, in a sum to be proven at trial.

38.  *Punitive damages:*  Defendants' conduct constitutes intentional misconduct to the extend that the discriminatory actions were done "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1) and Title VII of the Civil Rights Act of 1964, and thus entitles plaintiff to an award of exemplary and/or punitive damages.

a.  *Malice:*  Defendants' conduct was committed with malice within the meaning of 42 U.S.C. § 1981a(b)(1) and Title VII of the Civil Rights Act of 1964, including that (a) defendants acted with intent to cause injury to plaintiff and/or acted with reckless disregard for plaintiff's injury, including by terminating plaintiff's employment and/or taking other adverse job actions against plaintiff because of his participation in a Title VII hearing, and/or good faith complaints, and/or (b) defendants' conduct was despicable and committed in willful and conscious disregard of plaintiff's rights, health, and safety, including plaintiff's right to be free of discrimination, harassment, and retaliation.

b.  *Reckless indifference:* Defendants' conduct was committed with reckless indifference within the meaning of 42 U.S.C. § 1981a(b)(1) and Title VII of the Civil Rights Act of 1964, including that (a) defendants acted with intent to cause injury to plaintiff and/or acted with reckless disregard for plaintiff's injury, including by terminating plaintiff's employment and/or taking other adverse job actions against plaintiff because of his participation in a Title VII hearing, and/or good faith complaints, and/or (b) defendants' conduct was despicable and committed in willful and conscious

disregard of plaintiff's rights, health, and safety, including plaintiff's right to be free of discrimination, harassment, and retaliation.

39. *Attorneys' fees:* Plaintiff has incurred and continues to incur legal expenses and attorneys' fees.

40. *Exhaustion of administrative remedies:* Prior to filing this action, plaintiff exhausted his administrative remedies by filing a timely administrative complaint with the FDIC. This suit is brought within the time allotted.

## FIRST CAUSE OF ACTION
## <u>Discrimination on the Bases of Sex/Gender in Violation of</u>
## <u>Title VII of the Civil Rights Act of 1964</u>
## (42 U.S.C. § 2000 (e), *et seq.*)
## Against Entity Defendants and DOES 1-100, Inclusive

41. Plaintiff repeats, realleges, and incorporates by reference the allegations contained in all paragraphs set forth above and below, as though fully stated here.

42. At all times herein mentioned, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et. seq*, was in full force and effect and was binding on defendants. This statute requires defendants to refrain from discriminating against any employee on the basis of their sex/gender.

43. Plaintiff's sex/gender were substantial motivating reasons in defendants' decision to terminate plaintiff's employment, not to retain, hire, or otherwise employ plaintiff in any position, and/or to take other adverse employment actions against plaintiff.

44. As a proximate result of Defendants' willful, knowing, and intentional retaliation against plaintiff, plaintiff has sustained and continues to sustain substantial losses of earnings and other employment benefits.

45. As a proximate result of defendants' willful, knowing, and intentional discrimination against plaintiff, plaintiff has suffered and continues to suffer humiliation, emotional distress, and physical and mental pain and anguish, all to her damage in a sum

according to proof.

46.  Defendants' misconduct was committed intentionally, with malice and reckless indifference, and this entitles plaintiff to punitive damages against Defendants.

47.  Plaintiff has incurred and continues to incur legal expenses and attorneys' fees. Pursuant to Title VII of the Civil Rights Act of 1964, plaintiff is entitled to recover reasonable attorneys' fees and costs (including expert costs) in an amount according to proof.

### SECOND CAUSE OF ACTION
### <u>Hostile Work Environment / Harassment for on the Bases</u>
### <u>of Sex/Gender in Violation of Title VII of the Civil Rights</u>
### <u>Act of 1964</u>
### (42 U.S.C. § 2000(e), *et seq.*)
### Against All Defendants and DOES 1-100, Inclusive

48.  Plaintiff repeats, realleges, and incorporates by reference the allegations contained in all paragraphs set forth above and below, as though fully stated here.

49.  At all times herein mentioned, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et. seq*, was in full force and effect and was binding on defendants. This statute requires defendants to refrain from harassing against any employee on the basis of their sex/gender.

50.  Plaintiff was subjected to harassing conduct through a hostile work environment, in whole or in part on the bases of plaintiff's sex/gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et. seq*.

51.  Pursuant to Government Code section 12923(b), a single incident of harassing conduct is sufficient to create a hostile work environment if the harassing conduct has unreasonably interfered with plaintiff's work performance or created an intimidating, hostile, or offensive working environment.

///

52.  As a proximate result of Defendants' willful, knowing, and intentional retaliation against plaintiff, plaintiff has sustained and continues to sustain substantial losses of earnings and other employment benefits.

53.  As a proximate result of defendants' willful, knowing, and intentional discrimination against plaintiff, plaintiff has suffered and continues to suffer humiliation, emotional distress, and physical and mental pain and anguish, all to her damage in a sum according to proof.

54.  Defendants' misconduct was committed intentionally, with malice and reckless indifference, and this entitles plaintiff to punitive damages against Defendants.

55.  Plaintiff has incurred and continues to incur legal expenses and attorneys' fees. Pursuant to Title VII of the Civil Rights Act of 1964, plaintiff is entitled to recover reasonable attorneys' fees and costs (including expert costs) in an amount according to proof.

### THIRD CAUSE OF ACTION

### Retaliation for Engaging in Protected Activity in Violation
### of Title VII of the Civil Rights Act of 1964

### (42 U.S.C. § 2000(e), *et seq.*)

### Against All Defendants and DOES 1-100, Inclusive

56.  Plaintiff repeats, realleges, and incorporates by reference the allegations contained in all paragraphs set forth above and below, as though fully stated here.

57.  At all times herein mentioned, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et. seq*, was in full force and effect and was binding on defendants. This statute requires defendants to refrain from retaliating against any employee for making complaints or opposing discrimination, harassment, or retaliation, or otherwise engaging in activity protected by the Title VII of the Civil Rights Act of 1964, including for seeking to exercise rights guaranteed under Civil Rights Act of 1964, Title VII, and the assisting and/or participating in an investigation, opposing Defendants' failure to provide rights,

including rights to complain and to assist in a lawsuit, and/or the right to be free of retaliation, in violation of the Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et. seq.*

58.   Plaintiff's seeking to exercise rights guaranteed under Title VII of the Civil Rights Act of 1964 and/or opposing defendants' failure to provide such rights, including the right to be free of discrimination, harassment, or retaliation, in violation of Title VII of the Civil Rights Act of 1964, were substantial motivating reasons in defendants' decision to terminate plaintiff's employment, not to retain, hire, or otherwise employ plaintiff in any position, and/or to take other adverse employment actions against plaintiff.

59.   As a proximate result of Defendants' willful, knowing, and intentional retaliation against plaintiff, plaintiff has sustained and continues to sustain substantial losses of earnings and other employment benefits.

60.   As a proximate result of Defendants' willful, knowing, and intentional retaliation against plaintiff, plaintiff has suffered and continues to suffer humiliation, emotional distress, and physical and mental pain and anguish, all to her damage in a sum according to proof.

61.   Defendants' misconduct was committed intentionally, with malice and reckless indifference, and this entitles plaintiff to punitive damages against Defendants.

62.   Plaintiff has incurred and continues to incur legal expenses and attorneys' fees. Pursuant to Title VII of the Civil Rights Act of 1964, plaintiff is entitled to recover reasonable attorneys' fees and costs (including expert costs) in an amount according to proof.

///
///
///
///
///
///

## FOURTH CAUSE OF ACTION

**Failure to Prevent Discrimination, Harassment, and
Retaliation in Violation of Title VII of the Civil Rights Act
of 1964**

**(42 U.S.C. § 2000(e), *et seq.*)**

**Against All Defendants and DOES 1-100, Inclusive**

63.   Plaintiff repeats, realleges, and incorporates by reference the allegations contained in all paragraphs set forth above and below, as though fully stated here.

64.   At all times herein mentioned, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et. seq*, was in full force and effect and was binding on defendants.

65.   This statute states that it is an unlawful employment practice in California for an employer "to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring."

66.   During the course of Plaintiff's employment, Entity Defendants failed to prevent their employees from engaging in intentional actions that resulted in Plaintiff being treated less favorably because of plaintiff's sex/gender and/or because plaintiff engaged in protected activity.

67.   Plaintiff believes that he was subjected to discrimination, harassment and retaliation because of his sex/gender, and/or participation in protected activity.

68.   As a proximate result of Entity Defendants' willful, knowing, and intentional misconduct, plaintiffs have sustained and continue to sustain substantial losses of earnings and other employment benefits.

69.   As a proximate result of Entity Defendants' willful, knowing, and intentional misconduct, plaintiffs have suffered and continue to suffer humiliation, emotional distress, and physical and mental pain and anguish, all to their damage in a sum according to proof.

70.   Defendants' misconduct was committed intentionally, with malice and reckless indifference, and this entitles plaintiff to punitive damages against Defendants.

///

71.   Plaintiff has incurred and continues to incur legal expenses and attorneys' fees. Pursuant to Title VII of the Civil Rights Act of 1964, plaintiff is entitled to recover reasonable attorneys' fees and costs (including expert costs) in an amount according to proof.

## PRAYER

WHEREFORE, plaintiff, James Brian Kiss, prays for judgment against defendants as follows:

1.   For general and special damages according to proof;

2.   For exemplary damages, according to proof;

3.   For injuries to Plaintiff's person;

4.   For pre-judgment and post-judgment interest on all damages awarded;

5.   For reasonable attorneys' fees;

6.   For costs of suits incurred;

7.   For declaratory relief;

8.   For equitable relief, such as reinstatement, instatement, the provision of opportunities to make up for any lost promotional prospects, and the restoration of seniority, along with any other grounds for equitable relief that may arise during this litigation and any other equitable relief deemed proper by the Court; and

9.   For such other and further relief as the Court may deem just and proper.

ADDITIONALLY, plaintiff, James Brian Kiss, demands trial of this matter by jury. (F.R.C.P. 38(b).)

Dated:  March 6, 2025          SHEGERIAN & ASSOCIATES, INC.

By: _____
     Carney R. Shegerian, Esq.
     Attorneys for Plaintiff,
     JAMES BRIAN KISS